# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM HUBBARD, JR. and HUBBARD'S FISHING FLOAT & CAFÉ, L.L.C.,<br><br>Defendants. | No. C18-1035-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON MOTION FOR DEFAULT JUDGMENT** |

_____

## *I.      INTRODUCTION*

This case is before me on a motion (Doc. No. 10) for default judgment by plaintiff United States of America (the Government). Defendants have filed a resistance (Doc. No. 15) and the Government has filed a reply (Doc. No. 20). I find that oral argument is not necessary. *See* Local Rule 7(c).

## *II.      PROCEDURAL HISTORY*

On September 21, 2018, the Government filed its complaint (Doc. No. 1) for ejectment and injunctive relief. Service of the complaint was not easily accomplished due to defendant William Hubbard Jr.'s attempts to evade service – as described in Judge Mahoney's order denying defendants' motion to set aside the entry of default. *See* Doc. No. 29 at 3-5. On October 29, 2018, the Government moved for the entry of default and the Clerk of Court entered default the same day. *See* Doc. Nos. 6, 7. Defendants' counsel sent a letter to the Government dated November 13, 2018, asking to speak about defendants' case. *See* Doc. No. 29 at 6. The Government provided defendants' attorney with the relevant court documents. *Id.*

On November 27, 2018, defendants filed a motion (Doc. No. 9) to set aside the default entry. On December 11, 2018, the Government filed its motion (Doc. No. 10) for default judgment. On December 17, 2018, defendants filed an answer (Doc. No. 12). Judge Mahoney denied defendants' motion to set aside the default entry on March 29, 2019. *See* Doc. No. 29. Defendants had the opportunity to appeal Judge Mahoney's ruling to me but did not do so. *See* Fed. R. Civ. P. 72(a); *see also* N.D. Ia. L.R. 72A (providing that a party who objects to a magistrate judge's order on a civil pretrial matter must file objections within 14 days after service of the order). Because default has been entered, and has not been set aside, I consider whether the Government is entitled to the entry of judgment by default.

### III. APPLICABLE STANDARDS

Federal Rule of Civil Procedure 55 provides, in relevant part:

(a) ENTERING A DEFAULT. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

(b) ENTERING A DEFAULT JUDGMENT.

(1) *By the Clerk*. If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2) *By the Court*. In all other cases, the party must apply to the court for a default judgment. . . . If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:

    (A) conduct an accounting;

        (B)    determine the amount of damages;
        (C)    establish the truth of any allegation by evidence; or
        (D)    investigate any other matter.

Fed. R. Civ. P. 55(a)-(b). Thus, as this court has explained:

> "Entry of a default under Federal Rule of Civil Procedure 55(a) is not, as such, entry of a judgment; it merely permits the plaintiff to move for a default judgment under Rule 55(b)(2), assuming that the default is not set aside under Rule 55(c)." Moreover, "'a default judgment cannot be entered until the amount of damages has been ascertained.'" . . . Thus, if the judgment sought is not for a sum certain, Rule 55(b)(2) provides that "the court may conduct such hearings or order such references as it deems necessary and proper" in order to "enable the court to enter judgment . . . ." In short, as this court has explained, Rule 55 "requires two steps before entry of a default judgment: first, pursuant to Fed.R.Civ.P. 55(a), the party seeking a default judgment must have the clerk enter the default by submitting the required proof that the opposing party has failed to plead or otherwise defend; second, pursuant to Fed.R.Civ.P. 55(b), the moving party may seek entry of judgment on the default under either subdivision (b)(1) or (b)(2) of the rule."

*Hayek v. Big Brothers/Big Sisters of America*, 198 F.R.D. 518, 520 (N.D. Iowa 2001) (citations omitted).

      Here, the Government has successfully completed the first step by making the showing necessary for the entry of defendants' default pursuant to Rule 55(a). Doc. Nos. 6, 7. Upon entry of default, "the factual allegations of a complaint (except those relating to the amount of damages) are taken as true, but 'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2688 at 63 (3d ed. 1998)). Thus, in determining whether a plaintiff is

entitled to a default judgment, I must consider whether the factual allegations set forth in the complaint, when accepted as true, establish the defendants' liability.[1]

The next step typically concerns the calculation of damages. However, this case seeks equitable relief in the form of ejectment and an injunction. I will determine whether such relief is warranted under these circumstances.

### IV.   ANALYSIS

#### A.   *Relevant Facts*

The complaint alleges that defendants are trespassing and unlawfully occupying property owned by the United States, namely Upper Mississippi River National Wildlife and Fish Refuge Lands (the Property). Doc. No. 1 at 1. It states that this court has jurisdiction pursuant to 28 U.S.C. § 1345 and venue is proper because the alleged actions are occurring on real property located in Allamakee County, which is in the Northern District of Iowa. *Id.* at 1-2. The complaint states the Government acquired the Property[2] by direct purchase in 1930 under the authority of the Upper Mississippi River National Wildlife and Fish Refuge Act. *Id.* at 3. A copy of the deed is attached to the complaint as Exhibit A. *Id.*

Defendant William Hubbard, Jr. (Hubbard), operates a fishing float on the portion of the Mississippi River that fronts the Property and is below Lock and Dam No. 9. *Id.* At the time this case was commenced, defendant Hubbard's Fishing Float & Café, LLC,

---

[1] Defendants filed an untimely answer denying all allegations in the complaint. *See* Doc. No. 12. However, I will not consider that answer due to Judge Mahoney's unchallenged finding that defendants do not meet the "good cause" standard under Rule 55(c) given that Hubbard is blameworthy for his failure to timely appear based on his attempts to evade service and defendants do not appear to have a meritorious defense. *See* Doc. No. 29 at 7-16.

[2] The Property is described as Government Lot 11, Section 17, Township 97 North, Range 2 West, 5th Principal Meridian, Allamakee, County, Iowa. *See* Doc. No. 1 at 2-3.

4

was an inactive limited liability company[3] formed in Iowa and the legal entity through which Hubbard owns and operates the float. *Id.* According to the complaint, the fishing float operates like a large dock that extends across the river. Customers pay Hubbard to fish on the float and he offers refreshments and gear for sale. *Id.* The float attaches to and is constructed on the Property. *Id.* Indeed, several feet of the float attach to and are located on the Property. A copy of a survey dated November 15, 2016, is attached to the complaint as Exhibit B. *Id.* The complaint alleges it is unlawful to trespass on a national wildlife refuge, to occupy a private structure on a national wildlife refuge, or to conduct a commercial enterprise on a national wildlife refuge. *Id.* While it is possible to obtain a permit to operate a float in or on a national wildlife refuge, the last permit issued to defendants to operate the float at issue expired on July 31, 2008. *Id.* at 3-4.

The Government seeks an order ejecting defendants from the Property, ordering defendants to remove all personal property and structures from the Property and enjoining defendants from future unauthorized occupancy and use of Upper Mississippi River National Wildlife and Fish Refuge lands. *Id.* at 4.

B.  *Discussion*

I must determine whether default judgment is appropriate by considering whether defendants' conduct involves "willful violations of court rules, contumacious conduct, or intentional delays," *see Ackra Direct Marketing Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996), and if so, whether the factual allegations set forth in the complaint, when accepted as true, establish defendants' liability. With regard to the first inquiry, I note that Judge Mahoney denied defendants' motion to set aside the entry of default based, in part, on defendants' willful conduct in evading service. She summarized Hubbard's conduct as follows:

---

[3] As discussed in Judge Mahoney's order, (Doc. No. 29), Hubbard filed paperwork to reinstate the LLC in October 2018 after the Government initiated this lawsuit. *See* Doc. No. 29 at 1.

5

Prior to filing the current case, counsel for the Government informed Hubbard by letter dated August 6, 2018, that his dock trespassed onto federal property and that he needed to remove it, or further action would be taken. Doc. 11-2 at 5. The letter also asked that Hubbard or his attorney contact counsel for the Government within fourteen days of receiving the letter to discuss next steps. *Id.* Rather than sending the letter through the mail, counsel for the Government asked an Officer for the Fish and Wildlife Service to hand-deliver the letter to Hubbard on his dock. Doc. 11-2 at 2-3. On August 9, 2018, the officer attempted to do so, telling Hubbard who sent the letter and what it said, but Hubbard refused to accept it. Doc. 11-2 at 3. The officer left the letter in the door of the cabin attached to the dock after informing Hubbard he was doing so. *Id.*

After receiving no word from Hubbard or an attorney, the Government filed a complaint on September 21, 2018, seeking that Defendants and their property be ejected from the Government's land and enjoined from future occupancy. Doc. 1. On October 3, 2018, the Government served the registered agent for the then-inactive LLC with the complaint (later, the registered agent sent the Government a letter indicating that it lacked a forwarding address for the inactive LLC and could not accept service on its behalf). Doc. 4; Doc. 11 at 7 n.2.

On Thursday, October 4, 2018, the Government attempted to serve Hubbard with the complaint at his residence. The Government submitted a declaration from the sheriff's deputy who attempted service that day. Doc. 11-3 at 2. According to the deputy, he was traveling in a marked squad car down a one-lane road behind a truck pulling a boat, looking for Hubbard's residence, when the truck stopped, blocking the roadway. Doc. 11-3 at 3. A man who turned out to be Hubbard exited the truck and asked the deputy what he was doing. *Id.* The deputy explained that he needed to serve civil court papers on Hubbard. *Id.* The deputy attempted to serve the papers on Hubbard, but Hubbard grew more and more agitated, threatening to throw the papers on the ground and stating the deputy could give them to his (unnamed) attorney. *Id.* The deputy decided not to leave the paperwork with Hubbard and instead contacted a supervisor about how to handle the situation. *Id.* This contact with Hubbard near his residence occurred a little before 3:00 p.m. *See id.*; Doc. 28 at 1-3.

The next day, another sheriff's deputy (the supervisor) attempted once again to serve Hubbard at his residence, this time around 11:20 a.m. Doc. 11-4 at 4; Doc. 28 at 1, 5. According to his declaration and report,

he parked his marked squad car in Hubbard's driveway and knocked on a door in a porch area for several minutes with no response. Doc. 11-4 at 2-3. When he peered through the window, he could see an individual standing inside. *Id.* He knocked on the door again, but when he received no answer and realized he could no longer see the individual through the window, he left the papers wedged in the door, noting that the porch area where the door was located appeared to be well traveled and used often. *Id.* He returned the summons as executed, checking the box marked "other" and noting that "Hubbard refused to open the door to take the papers, [Hubbard] said he isn't taking them go serve his lawyer, Deputy left the papers in the door for [Hubbard]." Doc. 5 at 2. At the hearing, the Government clarified that the deputy did not speak to Hubbard on October 5 and that the return of service referred to Hubbard's statements made to the first deputy the day prior.

> Hubbard submitted an affidavit stating:
>
> With regard to the deputy's affidavit of service, I deny that I intentionally refused to accept service. When the deputy arrived, I told him to talk to my lawyer because I believed that was the proper thing to do. I know now that was not the right thing to do and I regret doing it. The deputy did not say anything about wanting to serve court papers on me. I do not recall the deputy coming to my door and knocking on my door. As I recall, after I told him to see my lawyer, he simply drove away in his vehicle, without saying anything. I did not see him leave the papers and I did not discover the papers until [the week of November 19], after having been advised by my attorney that they had been left in my door. The house where I live does not have an outside door for papers to be left in.

Doc. 9-1. Hubbard's statement appears to describe the events of October 4. After the hearing, Hubbard submitted a second affidavit regarding service on October 5:

> I was not at home at the time that [the deputy] says he came to my residence on or about October 5, 2018. I leave my home by 7:00 a.m. seven days a week during the season (which includes October) and I do not return until at least 7:00 p.m. If [the deputy] saw somebody inside of my house, which

> I doubt, it was definitely not me. There is a life-sized carved wooden figure in my living room that the deputy could have mistaken for a human being. The windows on my home are made of a textured glass, which means that someone standing on the outside is unable to see the inside of my house definitively. A person may be able to see outlines and general shapes, but they cannot see specific details of whom or what is inside my home. . . . [The deputy] says . . . that he left a copy of the lawsuit papers in the front door of my house. However, I was unaware of the papers until late November when my lawyer told me that they had been left there. I normally do not use the front door to go in and out of my house. When I found the papers in November, they were lying on my porch and they were soaking wet. . . . [On] neither . . . October 4 or October 5 . . . was I advised by the deputy that a lawsuit had been filed and that I had a deadline for responding. At no time was I otherwise aware that a lawsuit had been filed against me prior to my attorney advising me in late November 2018.

Doc. 26-1 at 3-4.

Defendants did not file an answer to the complaint within twenty-one days of service as required by Federal Rule of Civil Procedure 12(a)(1)(A)(i) (in the meantime, Hubbard filed the paperwork to reinstate the LLC). On October 29, 2018, the Government moved for default entry, which was granted by the Clerk of Court that same day. Docs. 6, 7. The entry of default mailed to the LLC's registered agent was returned as not deliverable and noted the registered agent lacked a forwarding address for the LLC. Doc. 8. In an attempt to ensure Hubbard received a copy of the default entry, the Government sent it to him by regular mail, certified mail, and FedEx. Hubbard never signed for the certified mail. A FedEx driver attempted to deliver the default entry to Hubbard's residence on October 31, 2018, but no one was home, and the package required a signature. Doc. 11-5. When the driver called Hubbard and told him who sent the package, Hubbard "became rather abrupt and said, 'I told them to send any information directly to my lawyer.'" *Id.* The driver indicated he could not deliver the package elsewhere, and Hubbard confirmed that he wished to refuse the package so that it was returned to the sender. *Id.* The package was coded as "refused" and returned. *Id.*

Doc. No. 29 at 3-5.

In analyzing Hubbard's blameworthiness or culpability, Judge Mahoney found Hubbard's assertions that he was not trying to evade service lacked credibility. *Id.* at 7. She pointed out that each time the Government tried to contact Hubbard, he refused to accept papers from the process server. He also became agitated when a sheriff's deputy attempted to serve him on October 4 and twice refused papers telling the process server to give the documents to his attorney without telling them who his attorney was. *Id.* at 7-8. Judge Mahoney also found it noteworthy that Hubbard submitted paperwork to reinstate the LLC defendant (which had been inactive for the past eight years) just four days after the deputy left the papers on Hubbard's porch. *Id.* at 9. For the reasons stated by Judge Mahoney, I agree that Hubbard had notice of the lawsuit and his attempts to evade service render him blameworthy in his failure to timely appear. *Id.* at 11-12.

In considering this conduct in light of the Government's motion for default judgment, I find that it goes beyond a "marginal failure to comply with time requirements." *Ackra Direct Marketing Corp.*, 86 F.3d at 856. Rather, it is "willful, contumacious or intentional." *Id.* at 857. Hubbard was well aware that the Government wanted him to remove his dock from federal property. He had multiple opportunities to accept service of the complaint and defend his position. Instead, he willfully refused service on several occasions and, despite his actual notice of the lawsuit, failed to act in a timely manner. Such conduct exceeds excusable neglect and cannot be ignored by allowing Hubbard to put up a defense at this late juncture.

With regard to the second inquiry of whether the Government is entitled to default judgment, the Government relies on a sworn declaration of John Taivalkoski, a senior land surveyor for the Fish and Wildlife Service, in addition to the allegations in the complaint. *See* Doc. No. 10-2. Taivalkoski explains that the float extends onto and attaches to the Property because the float extends above what is known and recognized as the Ordinary High Water Mark. "It is well established under Iowa law that riparian owners along the bank of a navigable stream hold title to the land only to the high-water

mark and that ownership of the river bed from the highwater mark to the thread of the stream is in the State." *Tyson v. Iowa*, 283 F.2d 802, 807-08 (8th Cir. 1960). Congress has stated that "no person shall . . . possess any real or personal property of the United States . . . in any area of the [National Wildlife Refuge] System . . . unless such activities are permitted either under subsection (d) of this section or by express provision of the law." 16 U.S.C. § 668dd(c). While there is an authorized permitting process to operate a fishing float on federal property, *see* 16 U.S.C. § 6688dd(d)(1)(A), the defendants have conceded that the permit for Hubbard's Fishing Float and Café, LLC, expired on July 31, 2008. *See* Doc. No. 15-1 at 1. The Government's complaint, motion for default judgment, brief in support of its motion for default judgment and declaration from Taivalkoski all establish that defendants are improperly and unlawfully occupying property of the United States.

With regard to the requested relief, I agree that injunctive relief requiring the float and all personal property to be removed from the Property is appropriate. *See Perko v. United States*, 204 F.2d 446, 450 (8th Cir. 1953) ("Since the purpose of the suit in this instance was to enjoin actions of the defendants which interfered with the operation and management of a national forest reservation, injunction was the proper and appropriate remedy."); *United States v. Bundy*, No.2:12-cv0804-LDG-GWF, 2013 WL 3463610, at *3 (D. Nev. July 9, 2013) ("the United States is entitled to injunctive relief as a matter of law once trespass on federal lands is proven."); *United States v. Hosteen Tse-Kesi*, 191 F.2d 518, 520 (10th Cir. 1951) ("The defendants were charged with being willful and continuous trespassers upon the lands of the United States. If this charge was proved to the satisfaction of the court an injunction should issue."); *United States v. Nogueira*, 403 F.2d 816, 825 (9th Cir. 1968) ("The district court may not deny the United States injunctive relief or damages if trespass upon public lands is shown."); *United States v. Kahre*, No. 2:10-CV-1198-KJD-LRL, 2012 WL 2675453 (D. Nev. July 5, 2012) ("Routinely courts order trespassers to remove from the public lands all unauthorized

personal property, equipment, or buildings within 90 days."). The Government has demonstrated it is entitled to default judgment on its complaint against defendants.

## V. CONCLUSION

For the reasons stated herein, plaintiff's motion (Doc. No. 10) for default judgment is **granted**. I hereby order the following:

(1) Defendants and any affiliated entities must vacate the Property within 60 days of entry of this order.

(2) Defendants must remove all personal property and structures from the Property within 60 days from the entry of this order.

(3) The United States is hereby authorized to physically remove defendants and any personal property and structures from the Property if defendants fail to comply with this order within 60 days of its entry.

(4) The United States is hereby authorized to take title to and possession of all personal property and structures not removed from the Property within 60 days of entry of this order and to dispose of the same without further order from this court.

(5) The United States is entitled to any costs incurred to enforce its right of possession and for any necessary restoration or cleanup of the Property.

(6) Defendants are hereby enjoined from using or occupying – without lawful authorization – Upper Mississippi River National Wildlife and Fish Refuge lands.

**IT IS SO ORDERED.**

**DATED** this 22nd day of April, 2019.

_____
Leonard T. Strand, Chief Judge